IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

CITY OF PONTIAC POLICE AND FIRE )
RETIREMENT SYSTEM, )
) NO. 3:20-cv-00874
    Plaintiff, )
) JUDGE RICHARDSON
v. )
)
CYNTHIA T. JAMISON, et. al, )
)
    Defendants. )

## MEMORANDUM OPINION

Pending before the Court is Defendants' Motion to Dismiss the Shareholder Derivative Complaint (Doc. No. 40, "Motion"), filed by all Defendants, namely Cynthia Jamison, Thomas Kingsbury, Ricardo Cardenas, Ramkumar Krishnan, Edna Morris, George MacKenzie Jr., Denise Jackson, Mark J. Weikel, Harry Lawton III, Peter Bewley, and Gregory Sandfort and Nominal Defendant Tractor Supply Company ("Tractor Supply"). Plaintiff responded. (Doc. No. 47). Defendants thereafter replied. (Doc. No. 55). Both sides filed, respectively, notices of supplemental authority. (See Doc Nos. 56, 57, 59, 60, 61, 62, 63, and 64).

## BACKGROUND[1]

Plaintiff, City of Pontiac Police and Fire Retirement System,[2] has been a shareholder of Tractor Supply since July 2017. (Doc. No. 1 at ¶ 22). Tractor Supply—whom Plaintiff has included

---

[1] The facts in this section are taken from the Complaint (Doc. No. 1) and are accepted as true for purposes of the Motion. To the extent that allegations referred to below are legal conclusions, however, they are not accepted as true but rather are identified as merely what Plaintiff claims, and not what the Court is accepting as true for purposes of the Motion.

[2] This is a shareholder derivative action, meaning an action by one or more shareholders of a corporation to "enforce a *corporate* cause of action against officers, directors, and third parties."

in the lawsuit as a Nominal Defendant—is a Delaware corporation with its principal offices located in Brentwood, Tennessee. (*Id.* at ¶ 23). Defendants Cynthia Jamison, Thomas Kingsbury, Ricardo Cardenas, Ramkumar Krishnan, Edna Morris, George MacKenzie Jr., Denise Jackson, Mark J. Weikel, Harry Lawton III, Peter Bewley, and Gregory Sandfort are current[3] and former members of Tractor Supply's Board of Directors ("Board"). (*Id.* at ¶¶ 24-34). More specifically, Defendants Bewley and Sandfort each served on the Board for a number of years until 2019, (*id.* at ¶¶ 33-34), and each of the remaining Defendants currently serve on the Board, with the length of their service varying from Defendant to Defendant (*Id.* at ¶¶ 24-32). Jamison is the current Chairman of the Board. (*Id.* at ¶ 24).

Defendants have publicly and repeatedly represented Tractor Supply as a company that promotes diversity with respect to leadership roles, including seats on the Board. (*Id.* at ¶ 2). Specifically, Defendants have represented that "as board members," they are "champions for diversity and equality." (*Id.*). However, no African American individuals served on the Board in 2020 or for at least five years. (*Id.* at ¶ 3). At Tractor Supply, there are nine members on the Board,[4]

---

*Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991) (quoting *Ross v. Bernhard*, 396 U.S. 531, 534 (1970)). Here, Plaintiff brings it on behalf of Tractor Supply to redress injuries allegedly suffered, and to be suffered, by Tractor Supply due to Defendants' alleged breaches of fiduciary duties and violations of law. Thus, Plaintiff—as a shareholder of Tractor Supply—is bringing these claims derivatively on behalf of Tractor Supply because the alleged injuries were suffered by the Tractor Supply corporation and not by Plaintiff in its individual capacity. (Doc. No. 1 at ¶ 75); *see Casden v. Burns*, 306 F. App'x 966, 968 (6th Cir. 2009) (involving a Plaintiff bringing derivative claims against Defendant on behalf of a corporation and its shareholders).

[3] In this context, "current" means current as of the time the Complaint was filed, October 9, 2020. Likewise, references to alleged circumstances phrased in the present tense (such as an allegation that no American Americans hold an executive management position at Tractor Supply) are references to circumstances as they existed, according to the Complaint, at the time of the filing of the Complaint.

[4] Consistent with common parlance, the Court at times herein uses the term "director" to refer to a member of a board of directors (including the particular board of directors involved in this case,

and each serves for a period of one year at a time. (*Id.* at ¶¶ 76, 81). Thus, during the five-year period between 2015 and 2020, Defendants had up to 45 opportunities to nominate an African American candidate to the Board and yet never did so. (*Id.* at ¶ 81). Similarly, no African American currently holds a position on Tractor Supply's eleven-person executive management team. (*Id.* at ¶¶ 6, 81). Tractor Supply is one of the few remaining publicly traded companies without a single male or female African American director. (*Id.* at ¶ 5).

Plaintiff claims that these facts establish that Defendants are not committed to promoting, and have not promoted, racial diversity. (*Id.* at ¶ 8). Furthermore, Plaintiff asserts that instead of adding African American individuals to the Board, Defendants have opted to have the Company issue platitudes. (*Id.*). For example, "Defendants have publicly (and repeatedly) represented Tractor Supply as a company that effectively promotes diversity throughout its ranks, including in the boardroom." (*Id.* at ¶ 2). And "Defendants similarly have represented that, '[a]s board members,' they are 'champions for diversity and equality.'" (*Id.*) (some internal quotation marks omitted). Likewise, Defendants repeatedly have represented (including in at least its 2020 proxy statement) that "it is important that the Board members represent diverse viewpoints" and, therefore, "the Corporate Governance Committee is committed to actively seeking highly qualified women and individuals from minority groups to include in the pool from which Board nominees are selected"—all while being aware that there have been no African Americans on Tractor Supply's Board for at least five years and that no African American holds an executive management position at Tractor Supply. (*Id.* at ¶ 3).

---

*i.e.*, the Board), and "directors" to refer to multiple members of a board of directors. Likewise, the Court uses the capitalized term "Director" to refer to any individual Defendant who served on this particular Board.

Moreover, Defendants caused Tractor Supply to represent (falsely, according to Plaintiff) in Tractor Supply's 2020 proxy statement that:

- "The Board of Directors of Tractor Supply Company is committed to the principles of diversity and inclusion. We have built a strong and diverse Board of Directors by purposefully seeking highly qualified diverse candidates with different backgrounds, perspectives, ideas and skill sets." (*Id.* at ¶ 4).

- "Diversity and inclusion are values ingrained in our culture and essential to our business. We believe that a board comprised of directors with diverse backgrounds, unique skill sets and experiences, and individual perspectives improves the discussions and decision-making process which contributes to overall Board effectiveness." (*Id.*).

- "We believe that a diverse and inclusive workplace will enhance our ability to attract and retain the best talent to better serve our customers." (*Id.*).

Likewise, Defendants caused Tractor Supply to represent (falsely, according to Plaintiff) in Tractor Supply's *Diversity and Inclusion Statement* that:

- "We are committed to providing a diverse and inclusive culture where we foster different perspectives, ideas and innovative thinking. One of our values is respect –the starting point for our diversity and inclusion efforts." (*Id.*) (internal quotation marks omitted).

- "We are committed to providing a diverse and inclusive culture supported by our Mission & Values where we respectfully foster different perspectives, ideas and innovative thinking." (*Id.*).

- "Diversity and inclusion are the backbone of a vibrant workforce and essential to our success." (*Id.*).

- "Diversity and inclusion play a key role in moving our business forward" (*Id.*)

Plaintiff claims that these statements are no more than corporate platitudes and do not satisfy Tractor Supply's public commitment to diversity.[5] (*Id.* at ¶ 5).

As a Tractor Supply shareholder, Plaintiff asserts that enhancing shareholder wealth is each Director's fundamental duty and that diversity serves the best interests of shareholders because it

_____

[5] Some of the above quotations are repeated (at least in part) at least once later in the Complaint.

maximizes shareholder wealth. (*Id.* at ¶¶ 38-47). Plaintiff claims that the lack of racial diversity on the Board and executive management team has contributed to economic disparities at Tractor Supply. (*Id.* at ¶ 63). For example, as recently as 2018 and 2019, the salary of Tractor Supply's CEO was more than 300 times higher than the median pay of all other employees, and Plaintiff alleges that the lack of diversity on the Board has contributed to these kinds of economic disparities.[6] (*Id.*). Additionally, Plaintiff asserts that instead of adding diversity to the Board (which Plaintiff claims would have resulted in substantial increases in shareholder value), Defendants have benefited financially by paying themselves millions of dollars in cash and stock awards each year. (*Id.* at ¶ 66).

Plaintiff claims that Defendants' actions constitute a violation of §14(a) of the Exchange Act and SEC Rule 14a-9 (Count I), which provide that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." (*Id.* at ¶ 93). Plaintiff brings additional claims against Defendants alleging that they each breached his or her fiduciary duty of loyalty, good faith, due care, oversight, and candor (Count II) and were unjustly enriched (Count III) by making these allegedly false representations about the level of diversity and equality at Tractor Supply. (*Id.* at ¶¶ 99-100, 104-05). Specifically, Plaintiff claims that Defendants caused Tractor Supply to make false or misleading statements about their effort to achieve a diverse Board,

---

[6] The Court does not perceive a clear (alleged) explanation as to why a lack of board-level diversity contributes to economic disparities within Tractor Supply; that is, the Court does not see where Plaintiff's alleged facts suggesting the absence of African American directors is associated with, or has any bearing on the existence of, a large disproportionality between a CEO's pay and the median pay for a company employee. The Court could speculate as to what (purported) explanation Plaintiff might offer, but the Court (appropriately) declines to so speculate.

and that this lack of candor is a breach of each Defendant's fiduciary duty as a director. (*Id.* at ¶ 18).

Based on these allegations, Plaintiff seeks monetary and punitive damages, costs and disbursements of this action, and other relief.[7]

In the Motion, Defendants and Nominal Defendant assert both that Plaintiff failed to adequately plead demand futility as required by Federal Rule of Civil Procedure 23.1 and that Plaintiff failed to state a claim upon which relief may be granted under Federal Rule of Civil Procedure 12(b)(6). (Doc. No. 40 at 1).[8] Plaintiff admits that it did not make a demand on the Board prior to this lawsuit (Doc. No. 1 at ¶¶ 17–18), arguing instead that a pre-suit demand on Defendants is excused as futile because (1) acting on such a demand could have subjected Defendants to social stigma or "cancellation,"[9] and (2) Defendants face a risk of personal liability

---

[7] Along with monetary and punitive damages, Plaintiff asks the Court to direct Tractor Supply to "take all necessary actions to remove the institutional structures preventing the Company from achieving its stated diversity objectives, including, but not limited to, adopting, implementing and maintaining [a set of] initiatives, policies and procedures designed to promote greater racial diversity, equity and inclusion . . ." (Doc. No. 1 at 38).

[8] The Court notes that when citing to a page in a document filed by one of the parties, it endeavors to cite to the page number ("Page ___ of ___") added by the Clerk's Office as part of the pagination process associated with Electronic Case Filing if such page number differs from the page number originally provided by the author/filer of the document.

[9] When Plaintiff asserts that Defendants (and thus, Tractor Supply) could have been "canceled," Plaintiff is referencing the recent "cancel culture" phenomenon. "Cancel culture" refers to the widespread practice of withdrawing support (or "canceling") public figures and companies after they have done or said something that is considered objectionable or offensive. In essence, being "canceled" destroys someone or something's force, effectiveness, or validity due to widespread public disapproval. "Cancel culture", Merriam-Webster, https://www.merriam-webster.com/dictionary/cancel%20culture; "Cancel culture", Dictionary.com, https://www.dictionary.com/e/pop-culture/cancel-culture/. The undersigned takes judicial notice of the content of these dictionary definitions to provide context for Plaintiff's argument, and not necessarily for any truth(s) that could be implied by their contents. *See United States v. Harris*, 331 F.2d 600, 601 (6th Cir. 1964) ("The Court may take judicial notice sua sponte."); *Energy Automation Sys., Inc. v. Saxton*, 618 F. Supp. 2d 807, 810 n.1 (M.D. Tenn. 2009) ("A court may

on the alleged claims. (*Id.* at 13–18; Doc. No. 40 at 2). The Court will reach only the Rule 23.1 analysis because, as discussed below, Plaintiff has failed to adequately plead facts excusing Plaintiff from the demand requirement of Rule 23.1 and Delaware state law.

## APPLICABLE LEGAL PRINCIPLES

### Fed. R. Civ. P. 23.1(b)

Federal Rule of Civil Procedure 23.1(b) provides that a shareholder derivative complaint must, in addition to being verified, do the following:

> (1) allege that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law;
>
> (2) allege that the action is not a collusive one to confer jurisdiction that the court would otherwise lack; and
>
> (3) state with particularity:
>
>> (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and
>>
>> (B) the reasons for not obtaining the action or not making the effort.

Fed. R. Civ. P. 23.1(b).

The Sixth Circuit has further explained the requirements that must be met under Rule 23.1 when a plaintiff has not made a demand, stating that "[i]n a shareholder derivative action, Fed. R. Civ. P. 23.1 requires that the plaintiff 'allege with particularity' the reasons for failing to make a

---

take judicial notice of the contents of an Internet website."); *see generally* Fed. R. Evid. 201 (providing that "[a] court may take judicial notice, whether requested or not" of a "judicially noticed fact" which "must be one not subject to reasonable dispute," a requirement satisfied if the fact is "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."); *New England Health Care Emp.'s Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003) ("A court that is ruling on a Rule 12(b)(6) motion may consider materials in addition to the complaint if such materials are public records or are otherwise appropriate for the taking of judicial notice.").

pre-suit demand." *McCall v. Scott*, 239 F.3d 808, 815 (6th Cir.), *amended on denial of reh'g*, 250 F.3d 997 (6th Cir. 2001). The same pleading requirement, adopted in Delaware Chancery Rule 23.1, was succinctly described as follows:

> 'Pleadings in derivative suits are governed by Chancery Rule 23.1, [meaning that they] . . . must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Chancery Rule 8(a). Rule 23.1 is not satisfied by conclusory statements or mere notice pleading. On the other hand, the pleader is not required to plead evidence. What the pleader must set forth are particularized factual statements that are essential to the claim.'

*Id*. (quoting *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000) (footnote omitted)). In other words, in cases where a shareholder has *not* made a pre-suit demand, "[t]he pleading requirement of Fed. R. Civ. P. 23.1 is the procedural embodiment of the substantive principle that a stockholder's right to prosecute a derivative suit is limited to situations in which demand is excused[.]" *Id.* at 816.

Demand futility requirement under Delaware state law: *Rales* and *Aronson*

Plaintiff must plead with particularity "the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3)(B). Plaintiff concedes that it did not make a pre-suit demand. That is to say, Plaintiff did not "mak[e] the effort" (via a pre-suit demand) to obtain the action within the meaning of Rule 23.1(b)(3)(B), and therefore under that rule must "state with particularity" the reasons for not doing so.

In *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 108–09 (1991), the Supreme Court articulated the prevailing rule that whether the failure to make a demand will be excused is determined under the substantive law of the state of incorporation. The parties agree that Tractor Supply is incorporated in the state of Delaware and that therefore Delaware state law governs the particulars of the present "demand futility" claim. (Doc. No. 1 at 10 ¶ 23, Doc. No. 41 at 11). *See also*, *e.g.*, *In re Finisar Corp. Derivative Litig.*, 542 F. Supp. 2d 980, 987 (N.D. Cal. 2008) ("Finisar

is incorporated in Delaware and, as such, the court turns to Delaware law to consider whether demand is excused.").

It is worth keeping in mind that "[t]he whole premise of Chancery Court Rule 23.1 and the demand requirement is that a stockholder is permitted, under appropriate circumstances, to bring suit on behalf of the corporation where the corporation [acting through its board of directors] refuses [a demand] to assert those claims directly." *Silverzweig v. Unocal Corp.*, No. CIV.A. 9078, 1989 WL 3231, at *4 (Del. Ch. Jan. 19, 1989), *aff'd sub nom. Silversweig v. Unocal Corp.*, 561 A.2d 993 (Del. 1989). But "[Delaware] law has established procedural imperatives to ensure that shareholders do not imping[e] on the managerial freedom of directors. [Therefore,] [t]o wrest control over the litigation asset away from the board of directors, the stockholder must demonstrate that demand on the board to pursue the claim would be futile such that the demand requirement should be excused." *Shabbouei v. Potdevin*, No. CV 2018-0847-JRS, 2020 WL 1609177, at *6 (Del. Ch. Apr. 2, 2020) (internal quotation marks omitted).

Delaware applies one of two tests, depending on the circumstances, to determine whether a plaintiff has adequately pleaded demand futility. One test (the "*Aronson* test") originated with *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984), *overruled in part by Brehm v. Eisner*, 746 A.2d 244, 255 (Del. 2000), and the other test (the "*Rales* test") originated in *Rales v. Blasband*, 634 A.2d 927 (Del. 1993). *See In re the Boeing Co. Deriv. Litig.*, No. CV 2019-0907-MTZ, 2021 WL 4059934 (Del. Ch. Sept. 7, 2021). *Rales*, which as indicated above was decided after *Aronson*, describes three scenarios in which the (default) *Aronson* test would *not* apply:[10] "[A] court should not apply

---

[10] *Aronson* was the test originally announced by the Delaware Supreme Court in this area of the law. By virtue both of its particular language and its being the first test to occupy this area, the *Aronson* test constitutes the more general, and effectively the default, test. This understanding is consistent with *Rales*, which merely provides a list of three circumstances under which *Aronson* would *not* apply—thus leaving *Aronson* to apply generally and in all other cases.

the *Aronson* test for demand futility where the board that would be considering the demand did not make a business decision that is being challenged in the derivative suit. This situation would arise in three principal scenarios: (1) where a business decision was made by the board of a company, but a majority of the directors making the decision have been replaced; (2) where the subject of the derivative suit is not a business decision of the board; and (3) where, as here, the decision being challenged was made by the board of a different corporation." *Rales*, 634 A.2d at 933.

"While the continued utility of a binary approach to demand futility has been called into question, for now, Delaware still applies one of two tests when deciding whether demand upon the board would be futile. The first, established in *Aronson v. Lewis*, 'applies to claims involving a contested transaction i.e., where it is alleged that the directors made a conscious business decision in breach of their fiduciary duties.' The second, established in *Rales v. Blasband*, applies where a majority of the current members of the board 'had not participated in the challenged decision,' or 'where the subject of a derivative suit is not a business decision ... [such as when the board is alleged to have violated its] oversight duties.'" *In re Boeing*, 2021 WL 4059934 at *22. *See also Guttman v. Huang*, 823 A.2d 492, 499–500 (Del. Ch. 2003) ("[T]hese kinds of allegations do not attack a specific business judgment of the board, and, therefore, the *Rales* test, and not the two-pronged demand excusal test of *Aronson v. Lewis*, is applied [to] determine whether demand is excused.").

## ANALYSIS

Applicable test: *Aronson* or *Rales*?

The parties disagree about which of the two tests, the original *Aronson* test or the more recent *Rales* test, applies here. Defendants contend that the *Rales* test applies because "Plaintiff

does not challenge a specific transaction or decision made by the Board" and instead challenges an alleged general failure by Defendants to promote racial diversity and to speak honestly about the company's "commitment to diversity." (Doc. No. 41 at 16). Plaintiff argues that that there *is* a business decision being challenged here, and that therefore the *Aronson* test instead applies. (Doc. No. 47 at 31).[11] In reply, Defendants state: "Plaintiff argues that the demand futility standard is supplied by *Aronson* . . . rather than by *Rales* . . . without identifying any 'business decision' that triggers the application of *Aronson*. Both decisions [*Aronson* and *Rales*] rely on the same 'substantial likelihood' of liability pleading standard for excusing demand on the ground of director interest, and Plaintiff fails both prongs of the *Aronson* test in any event." (Doc. No. 55 at 3) (citation omitted).

The Court recognizes the challenge of determining which test applies to a relatively amorphous shareholder derivative challenge to a series of actions, or perhaps inactions, by a board of directors (as well as the difficulties that arise when attempting to apply the rigid *Aronson* test to such a scenario). *See United Food & Com. Workers Union v. Zuckerberg*, 250 A.3d 862 (Del. Ch. 2020) (providing an in-depth discussion of the shortcomings of the *Aronson* test and the inability of its "analytical framework" to accommodate more modern, less "textbook" shareholder derivative actions, even where "[p]recedent . . . calls for applying *Aronson*"). With this challenge

---

[11] While asserting that the *Aronson* test should apply in this case, Plaintiff at the same time notes that the *Rales* test, "in reality, folds the two-pronged *Aronson* test into one broader examination." (Doc. No. 47 at 31 (citing *David B. Shaev Profit Sharing Acct. v. Armstrong*, No. Civ.A. 1449-N, 2006 WL 391931, at *4 (Del. Ch. Feb. 13, 2006), aff'd, 911 A.2d 802 (Del. 2006)). Thus, Plaintiff appears to be saying that although the *Aronson* test should be followed when analyzing whether its Complaint adequately alleged demand futility, an application of the *Rales* test would encompass the substance of the *Aronson* test in any event. The Court understands that, for multiple reasons (including potentially the one indicated here by Plaintiff), it conceivably could end up not mattering which of the two tests applies, but the Court nevertheless will decide which one applies.

in mind, and without either party stating in much detail the underlying facts which would warrant the application of one test over another, the Court undertakes its own analysis of which test applies.

The Court must consider Plaintiff's claims, count by count, to determine whether Plaintiff indeed challenges something appropriately characterized as a conscious business decision so as to warrant the application of the *Aronson* test. *In re Boeing*, 2021 WL 4059934, at *22.

As noted above, Count I alleges violations of §14(a) of the Exchange Act and SEC Rule 14a-9. Plaintiff alleges that the 2019 and 2020 Proxy Statements "omitted material facts, including the fact that Defendants were causing Tractor Supply to publicly feign support for diversity and inclusion at all levels of the Company, including feigning support for director candidates from minority groups to serve on the Board. Defendants were not committed to true diversity throughout Tractor Supply's ranks, including in the boardroom – facts that Defendants were aware of and participated in as set forth herein." (Doc. No. 1 at 36). Plaintiff claims that the 2019 and 2020 Proxy Statements were an "essential link" in shareholders following the company's recommendation to re-elect Defendants to the Board.

On one hand, this count involves Defendants allegedly failing to disclose certain facts regarding diversity at the company, which one could reasonably argue does not constitute a conscious business decision. On the other hand, one could argue that each preparation of a Proxy Statement constituted a conscious business decision to deceive the reader by failing to include complete and accurate facts regarding the actual extent of the Board's support for and commitment to diversity measures. But because Plaintiff explicitly states that Count I relies on *omissions* relating to the Proxy Statements, the Court preliminarily views Count I to more closely implicate the *Rales* framework.

Count II alleges a breach of fiduciary duty. Plaintiff alleges that "Defendants owed and owe Tractor Supply the highest obligation of loyalty, good faith, due care, oversight, and candor" which Defendants breached when they "intentionally or recklessly caused the Company to disseminate to Tractor Supply shareholders materially misleading and inaccurate information through, among other things, the SEC filings and other public statements and disclosures." (Doc. No. 1 at 37). Plaintiff claims in this count that Defendants "had actual knowledge of their misrepresentations and omissions of material fact or acted with reckless disregard for the truth in failing to ascertain and disclose such facts even though such facts were available to them." *Id*.

Further, Count II involves misrepresentations and omissions. Plaintiff claims that Defendants caused the company to disseminate certain information through filings and statements, knowing that these communications contained misrepresentations and omissions. Plaintiff does appear to be pointing to specific decisions or actions on the part of Defendants (i.e., specific SEC filings, public statements, or disclosures which omitted material information or contained misleading statements), but the bottom line seems to be that Plaintiff claims that these filings or statements *omitted* material information or were presented in a misleading way. Thus, the Court preliminarily finds that Count II also implicates more closely the *Rales* framework.

Finally, Plaintiff in Count III alleges unjust enrichment. Plaintiff claims "Defendants were unjustly enriched by their receipt of compensation while breaching fiduciary duties owed to Tractor Supply." (Doc. No. 1 at 38). Via this Count, Plaintiff does not point to any particular action by Defendants underlying the alleged unjust enrichment; Plaintiff's unjust enrichment claim focuses instead on Defendants' acceptance of compensation generally. Because this Count does not appear to challenge any particular Board action so as to implicate the *Aronson* test, it is

reasonable to conclude, and the Court preliminarily finds, that *Rales* is appropriately applied to this count.

And yet, even though the *Rales* test is the more appropriate test when viewing each Count contained in the Complaint, a colorable argument still can be made that the *Aronson* test is applicable. Plaintiff challenges each and every alleged decision made by Defendants regarding diversity efforts (or lack thereof), and, more importantly, what could be viewed as a conscious decision by Defendants to allegedly omit key information in each communication with its shareholders regarding the Board's diversity efforts and/or commitment to diversity and to make a decision to hire a non-African American individual each time a new Director was added. Further, the *Aronson* test is the default rule, which suggests that the Court should rely on (default to) it in an uncertain situation. Moreover, the three scenarios contemplated by *Rales* are not necessarily reflected in the facts alleged by Plaintiff, because: 1) the majority of the directors undisputedly have not been replaced here, 2) the subject of the derivative suit is arguably a long series of business decisions of Defendants, and 3) the decision being challenged undisputedly was not made by the board of a different corporation.

Nevertheless, the Court's conclusion is that the *Rales* test should govern here. Plaintiff is, in essence, challenging Defendants' overall practice of creating the appearance that the Board supports diversity when in fact it does not. Plaintiff's claims rest to a large extent on particular omissions or misrepresentations by Defendants. Rather than pointing to any particular business decision, Plaintiff in essence seems more to challenge the Board (and its members) on the grounds that it generally has failed its duty towards its shareholders—a challenge that would implicate the *Rales* test more clearly than the *Aronson* test. But in the interest of completeness, and because, as the parties admit, there is quite a bit of overlap between the *Rales* and *Aronson* tests, this opinion

will first apply the *Rales* test and then briefly discuss how the outcome would be no different under *Aronson* anyway.

The substance of the *Rales* test

Under *Rales*, "the appropriate inquiry is whether [the Complaint] raises a reasonable doubt regarding the ability of a majority of the Board to exercise properly its business judgment in a decision on a demand had one been made at the time [the] action was filed." *Rales*, 634 A.2d at 937. If the derivative plaintiff satisfies its burden of showing that the particularized factual allegations of the Complaint create a reasonable doubt that, at the time of its filing, the Board could have properly exercised its "independent and disinterested business judgment in responding to a demand," then demand will be excused as futile. *Id*. at 934. Whether such a reasonable doubt exists ultimately is a somewhat subjective question over which reasonable minds may differ, but it falls to this Court to answer this question by calling it like it sees it based on the allegations of the Complaint. *See Richardson v. Graves*, No. C.A. 6617, 1983 WL 21109, at *2 (Del. Ch. June 17, 1983) ("Clearly, though, even in deciding whether sufficient interest or bias exist to make demand futile, the judgment made by the Court is a difficult one but one which must necessarily be based on an objective analysis of the well pleaded facts.").

In making this determination, the Court keeps in mind some fundamental principles. "A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders." *Id*. at 936 (citing *Aronson*, 473 A.2d at 812). "A reasonable doubt as to disinterestedness is created when the particularized allegations in the complaint present a 'substantial likelihood' of liability on the part of a director." *Id*. (citing *Aronson*, 473 A.2d at 815).

The Court must assess demand futility under *Rales* (or *Aronson*, for that matter) on a director-by-director basis. Thus, to successfully invoke demand futility, the complaint must "plead facts specific to each director,[12] demonstrating that at least half of them could not have exercised disinterested business judgment in responding to a demand." *Desimone v. Barrows*, 924 A.2d 908, 943 (Del. Ch. 2007) (footnote added); *see also, e.g., In re Facebook, Inc. S'holder Derivative Priv. Litig.*, 367 F. Supp. 3d 1108, 1123–24 (N.D. Cal. 2019) ("[d]emand futility is assessed on a director-by-director basis"); *Hack v. Wright*, 396 F. Supp. 3d 720, 741 (S.D. Tex. 2019) ("[G]roup allegations are insufficient to excuse demand. Under Delaware law, a plaintiff must plead with particularity the reasons for excusing demand as to each director individually."). As the just-referenced, and many other, federal decisions make clear, this pleading requirement is applied in federal court; this is because, as noted above, the sufficiency of the complaint's particular allegations for excusing pre-suit demand is governed by the substantive law of the state in which the entity is incorporated—here, Delaware. *See Kamen*, 500 U.S. at 108–09. Significantly, under Delaware law (as under *Iqbal* and *Twombly*, and thus also this derivative action), "'conclusory allegations are not considered as expressly pleaded facts or factual inferences.'" *City of Cambridge*

---

[12] This aspect of the legal rule regarding demand futility calls to mind a separate, but related, federal pleading requirement that the Court raises *sua sponte* as an additional possible grounds for dismissal. A complaint must contain factual matter sufficient to identify which allegations pertain to which defendant (rather than lumping all defendants together without identifying the individual defendant or specifying the combination of defendants to which a particular claim or allegation relates). See *Davis v. Staramba Corp.*, No. 8:15-CV-1936-T-36MAP, 2015 WL 12838807, at *2 (M.D. Fla. Nov. 6, 2015) (dismissing complaint because it "contain[ed] a number of allegations that refer[red] to 'Defendant' or 'Defendants' without identifying the individual defendant or specifying the combination of defendants to which the allegation pertain[ed]."). Here, Plaintiff names each member of the Board as a defendant, yet makes no reference to any particular Director in the Complaint. Though the Court does not rest its decision solely on its view that Plaintiff's pleading is improper due to its lumping together of all Defendants, this failure does factor into the Court's analysis.

*Ret. Sys. v. Ersek*, 921 F.3d 912, 918 (10th Cir. 2019) (quoting *White v. Panic*, 783 A.2d 543, 549 (Del. 2001) (citation omitted)).

Importantly, demand futility "is a very onerous standard for a plaintiff to meet." *Richelson v. Yost,* 738 F. Supp. 2d 589, 597 (E.D. Pa. 2010); *accord In re Chemed Corp., S'holder Derivative Litig.*, No. CV 13-1854-LPS-CJB, 2015 WL 9460118, at *7 (D. Del. Dec. 23, 2015), *report and recommendation adopted sub nom. KBC Asset Mgmt. NV v. McNamara*, No. CV 13-1854-LPS-CJB, 2016 WL 2758256 (D. Del. May 12, 2016).

Plaintiff's pleading of demand futility

Seeking to satisfy this onerous standard, Plaintiff includes in the Complaint allegations of pre-suit demand futility. The Court notes that the Complaint's asserted reasons as to why making a demand on the Board would have been futile (which the Court hereinafter will refer to as Plaintiff's "futility allegations") consist: (i) primarily of what the Court will refer to generally as the "social-stigma allegations" (which posit that demand would have been futile, for some reason, in light of the social stigma implicated by Plaintiff's allegations of Defendants' wrongdoing)[13];

---

[13] The following quotations from the Complaint capture Plaintiff's pleaded "social-stigma allegations":

> [A] director implicated in making allegedly false or misleading statements about efforts to achieve a racially diverse board is left in a quandary. Especially after publicly expressing support for seeking "individuals from minority groups to include in the pool from which Board nominees are selected" for nomination to Tractor Supply's Board without success, as is alleged here. 2020 Proxy Statement at 18; 2019 Proxy Statement at 16. The cultural, legal and sociological risk calculus is dramatic. None of these risks is easily reconciled by a director enveloped in them without exposure to potential injury, measured not just in money, but in social and reputational capital as well. [. . .] A person of reasonable capacity and skill is not disinterested or otherwise detached from the outcome of such an inquiry. The stakes are too high; and the risk of "cancellation" to a director for actual or perceived hostility towards people of color is all too real. (Doc. No. 1 at 8).

and (ii) secondarily of what the Court will call the "personal-liability allegations" (which posit that a demand would be futile due to Defendants' inability to act disinterestedly and impartially in light of their potential liability on the claims reflected in the putative demand). The Court discerns multiple problems with Plaintiff's futility allegations that reveal themselves even before the Court reaches the *Rales* test.

First, Plaintiff makes no allegations regarding demand futility on a director-by-director basis; nor does Plaintiff do the equivalent, *i.e.*, make allegations regarding demand futility on a director-class basis, then explain why those allegations should apply to each specific director

---

A decision to act upon a pre-suit demand commences a potentially stigmatizing inquiry into a director, one that could expose the falsity of the director's publicly stated diversity objectives or question the director's fair treatment of African American director candidates. A decision to reject a pre-suit demand could result in equally dire consequences for a director. At one end of the spectrum, the public could view the director's previous statements supporting diversity as disingenuous and, therefore, false. Or worse yet, that director could be perceived by the public as hostile to African Americans, and, in the future, could be socially shunned. Hence, a pre-suit demand on the Tractor Supply Board is excused as futile. (Doc. No. 1 at 9).

Defendants' serialized inability to nominate any African American men or women to Tractor Supply's Board, despite up to 45 opportunities to achieve this key diversity objective, is antithetical to their fiduciary duty to act in the best interests of the Company and its shareholders. Given this, there is ample reason to doubt Defendants' capacity to distance themselves from the allegations enough to perform a disinterested, impartial and objective evaluation of a pre-suit demand. Therefore, a pre-suit demand on the Tractor Supply Board to commence this action is excused as futile. (Doc. No. 1 at 31).

Given the gravity of the claims, there is ample reason to doubt that Defendants can adequately detach themselves from not just the facts alleged, but also from the financial, social and reputational dynamics at play, to fairly consider a pre-suit demand. Without full confidence in Defendants' ability, individually and collectively, to evaluate a pre-suit demand with disinterest, impartiality and objectivity, and without concern for any personal considerations, financial or otherwise, a pre-suit demand on the Tractor Supply Board to commence this action is excused as futile. (Doc. No. 1 at 35).

named as a Defendant.[14] True, the social-stigma allegations are made essentially on a director-wide basis, but Plaintiff does nothing to plausibly allege that the social-stigma allegations apply to any of the particular Defendants; instead, essentially Plaintiff merely implies tacitly that because (according Plaintiff) the social-stigma allegations show that demand naturally would be futile with respect to the Board as a whole, the social-stigma allegations show that demand naturally would be futile with respect to each of the instant Defendants in particular. But were the Court to find the existence of adequate director-by-director allegations of demand futility based on such unspoken implications, it would run afoul of the established principle of Delaware law that pleading demand futility is very onerous. And so the Court finds that Plaintiff's futility allegations are inadequate due to their lack of director-specific allegations. This alone is enough to compel the Court to dismiss the Complaint for failure to make a pre-suit demand, although the Court below will address alternative bases for dismissal for failure to make a pre-suit demand.

Second, the Court simply cannot ascertain from the Complaint a single theory, or multiple theories that make sense vis-à-vis one another, as to why the social-stigma allegations (if accepted as true and applicable to each Defendant) suggest that demand would have been futile. In one place in the Complaint, the theory seems to be that a "[director] of reasonable capacity and skill is not disinterested or otherwise detached from the outcome of such an inquiry[,] [because] [t]he stakes are too high; and the risk of 'cancellation' to a director for actual or perceived hostility towards

---

[14] "While cases often conduct the inquiry one director at a time, it is not clear that is always required. In theory, at least, a plaintiff might be able to rely on sufficiently detailed factual allegations that apply to every member of the board, without expressly repeating those allegations for each member. That said, plainly there must be a showing that the relevant facts apply to each of the board members (up to the requisite number for a majority)—therefore, the 'director-by-director' analysis ensures both that is [sic] satisfied, and that no director is counted as interested merely because he or she is a member of the board." *Elliemaria Toronto Esa v. Nortonlifelock Inc.*, No. 20-CV-05410-RS, 2021 WL 3861434, at *4 (N.D. Cal. Aug. 30, 2021).

people of color is all too real." (Doc. No. 1 at 8). In other words, a director cannot be detached from the "outcome of such an inquiry"—presumably meaning the outcome of an inquiry leading to the decision as to how to respond to the demand—because the stakes are too high given the unique social stigma attached to actual or perceived white racism on the part of the director. But elsewhere, the theory is not that the director would be unable to be detached from the *outcome* of such an inquiry, but rather that *whatever* the outcome (whether to take action on the demand or to reject the demand), it is likely to be a bad one for the director. (Doc. No. 1 at 9). If so, that would suggest an *enhanced* ability of a director to be disinterested and independent, since the director is not choosing (on behalf of the company) between an option that is good for the director and an option that is bad for the director. In other words, in one place Plaintiff suggests that the director cannot be independent and disinterested in making a decision on the demand, because he or she has a vested interest in what the decision will be—while in another place Plaintiff suggests incongruously that the director cannot be independent and disinterested because it will be bad for the director either way, which would tend to reduce the extent to which the director is vested in what the decision will be. If a demand is such that the director realizes that he or she will be in bad shape either way the decision on it goes, then the director will not be motivated by a desire to make the choice that will avoid placing the director in a bad spot even if such choice is not in the company's best interests.

And elsewhere Plaintiff seems to advance a theory that is somewhat more general, *i.e.*, that because harsh allegations are made against each Defendant, and because unique "financial, social and reputational dynamics [are] at play" considering the particular nature of those allegations, Defendants cannot independently and impartially consider a pre-suit demand. (Doc. No. 31, 35).

The idea here seems to be that Defendants—whether or not vested in a particular[15] outcome from the Board's decision on the demand—cannot make an independent and impartial decision, given that the allegations (and the potential effects of such allegations) are especially serious.

In its brief in opposition to the Motion, Plaintiff does not invoke any of the three above-identified theories. Instead, Plaintiff writes in terms only of the inability of certain directors (namely, those on the current Board who were not on any of the prior Boards on which the Complaint is focused) to independently and impartially consider demands made based solely upon the conduct of *other* directors (those who were on some of those prior Boards, though perhaps also on the current Board). Plaintiff, referring to the social-stigma allegations, suggests that those allegations are so consequential that those directors ("unaccused directors") would feel a unique sense of empathy towards the other directors ("accused directors") that would cripple the unaccused directors' ability to decide independently and impartially on such a demand.

This argument is so different from anything suggested in the Complaint that Defendants assert that Plaintiff has waived any argument of demand futility based on the social-stigma allegations. The Court does not go so far, but it does note that the theory of demand futility based on the social-stigma allegations set forth in Plaintiff's brief is not even raised in the Complaint, let alone supported by factual matter asserted in the Complaint. And because the Court must decide this issue based on the allegations in the Complaint, the brief's new theory of demand futility is a

---

[15] In these parts of the Complaint, Plaintiff is not very clear about what *specifically* about the seriousness of the allegations, and the potential effects on Defendants in light of those allegations, cripples Defendants' independence and impartiality. As noted, Plaintiff elsewhere suggests that such seriousness means that Defendants are more vested in the decision on the demand. But in these parts of the Complaint, the Court is left to guess what else (if anything) about the sheer seriousness of the allegations impairs Defendants' independence and impartiality; the Court does not know, for example, whether Plaintiff is suggesting that the sheer stress of personally facing dire consequences, based on the seriousness of the allegations renders individual Defendants unable to make a fair decision on the demand.

non-starter, even if it was not technically waived (or forfeited). Moreover, the Complaint alleges that the Board has nine members, (Doc. No. 1, ¶ 76), and also alleges that nine of the 11 individual Defendants are on the current Board (by which the Court means, as indicated in a footnote above, the Board as of the time the Complaint was filed); from this, the Court gleans from Plaintiff's own Complaint that the current Board has no unaccused members, as every current Board Member is a Defendant accused of the wrongs that would be the subject of a demand. So the demand futility argument asserted in the brief, even if accepted in theory, would not apply to *any* of the current Directors—let alone to a majority of the members of the current Board as required to establish demand futility.

Setting aside the flawed argument in Plaintiff's brief in opposition to the Motion, the Court returns to the social-stigma allegations in the Complaint (and the three different theories of demand futility based thereon). Ultimately, given that the social-stigma allegations are general, rather terse, and to a substantial extent conclusory and internally inconsistent—and not specific as to individual directors and not persuasively supported by argument in briefing, as noted above—the Court cannot find that Plaintiff has met what is an "onerous" burden to plausibly allege demand futility based on the social-stigma allegations. This is true regardless of the applicable test, be it *Rales* or otherwise; the problem initially is with the necessary factual allegations themselves—and Plaintiff's failure to explain in briefing why they support the result it seeks— and not with how they fare under whatever test is applicable

Having said that, it is possible that application of the *Rales* suggests still further that the social-stigma allegations would be insufficient to plausibly allege demand futility even they were sufficiently fulsome to merit plenary consideration by the Court (which they are not). The Court

next addresses that issue, and then the question of whether the personal-liability allegations are, alternatively, sufficient to allege demand futility.

Analysis under _Rales_ and more general applicable principles of Delaware law

As discussed above, under the _Rales_ test demand is futile when the plaintiff has alleged facts creating a reasonable doubt that a board could have exercised its "independent" and "disinterested" business judgment in response to a demand. _Rales_, 634 A.2d at 934. The parties do not dispute whether the "independent" part of the _Rales_ test has been met[16]; thus, the Court need only determine whether Defendants could have exercised their "disinterested" business judgment in response to a demand. As to why the question should be answered in the negative, Plaintiff appears to (1) assert (in the Complaint although, crucially, not in briefing, as discussed above) the above-referenced three theories based on the social-stigma allegations; and (2) assert (very cursorily in the Complaint, and then in briefing) that Defendants are subject to a substantial likelihood of personal liability with respect to Plaintiff's claims.

And even if the Court entertains Plaintiff's three theories, each theory fails under the _Rales_ test. Plaintiff's first concern falls short of what the _Rales_ test requires. Under _Rales_, a board member is not considered "interested" simply because the demand would implicate some sensitive topic which might be uncomfortable for the board member to discuss or decide upon. _Rales_ contemplates the notion of an "interested" board member including not only _Aronson's_ notion (which refers to a board member having a personal financial stake, which is not present here)[17],

---

[16] _See_ Doc. No. 41 at 16–17 ("Plaintiff does not claim that any of the Demand Directors lacked "independence."). Plaintiff does not appear to dispute this statement.

[17] Plaintiff makes one argument that could possibly be construed as saying that Defendants had a personal financial stake in the diversity (or lack thereof) of the Board. In the section of the Complaint titled "Defendants Have Enriched Themselves at the Expense of Tractor Supply's

but also a board member facing potentially adverse personal consequence as a result of the board member making a decision regarding the demand. But Plaintiff points to no specific facts that would illustrate why making the requisite demand would have a "a materially detrimental impact on a director" here. *See In re Trados Inc. Shareholder Litig.*, C.A. No. 1512–CC, 2009 WL 2225958, at *6 (Del. Ch. July 24, 2009) ("A director is interested in a transaction if 'he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders' or if 'a corporate decision will have a materially detrimental impact on a director,

---

Shareholders by Making Misleading Statements About Tractor Supply's Commitment to Racial Diversity at the Top," Plaintiff states:

> In addition to denying Tractor Supply the substantial increases in shareholder value enjoyed by companies with greater board diversity, by entrenching themselves on Tractor Supply's Board, Defendants have benefited financially by paying themselves millions of dollars in cash and stock awards each year. *See Delivering through Diversity* at 13 ("We found that companies with the most ethnically/culturally diverse Boards worldwide are 43% more likely to experience higher profits.").
>
> [. . .]
>
> But rather than uphold Tractor Supply's commitment to diversity at all levels of the Company, Defendants chose instead to perpetuate Tractor Supply's practice of excluding African American directors. Consequently, many qualified African American candidates who would have allowed Tractor Supply and its shareholders to benefit from racial diversity on the Tractor Supply Board have been excluded. Conversely, by retaining their seats on the Tractor Supply Board, Defendants have profited handsomely, collectively pocketing over $2.2 million in fees, stock awards and other compensation in 2019 alone[.]

(Doc. No. 1 at ¶¶ 66–68). The Court fails to see the logic here. Plaintiff has alleged no factual matter that would plausibly suggest that by failing to hire diverse candidates, Defendants would benefit financially—Plaintiff has established no legitimate relationship between the Directors' compensation and Defendants selecting (or not selecting) African Americans as directors.

If anything, Plaintiff's argument here actually suggests that Defendants would be financially incentivized to hire a more diverse Board. Accepting as true Plaintiff's suggestion that companies with diverse boards experience higher profits, if Defendants were to diversify the Board, then Tractor Supply would enjoy higher profits—thus making it easier for Defendants to arrange for (and justify) Tractor Supply providing them higher compensation and greater stock awards.

but not on the corporation and the stockholders.'") (citing *Rales*, 634 A.2d at 936; *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d 611, 617 (Del. Ch. 1999)).

There is another overarching initial problem with Plaintiff's argument. To a large extent it amounts to an invitation for the Court to infer that Defendants are likely incapable of exercising sound judgment in response to a demand merely because Plaintiff has alleged directorial impropriety. The Court believes that this inference is unwarranted and should not be drawn. *Lewis v. Daum*, No. 6733, 1984 WL 8223, at *2 (Del. Ch. May 24, 1984) ("If, by plaintiff's merely alleging directorial impropriety the directors are to be presumed incapable of exercising sound judgment, Rule 23.1 would become virtually meaningless. Thus, merely alleging that the transaction approved by the directors constituted a wrong to the corporation does not rise to a charge of breach of fiduciary duty such as would demonstrate the futility of making a demand on the Board." (citing *In re Kauffman Mutual Fund Actions*, 1st Cir. 479 F.2d 257, 265 (1973))). Plaintiff suggests that the particular alleged impropriety in this case is such that, in the current socio-political environment, Defendants would be especially unlikely to exercise sound business judgment in response to a demand from Plaintiff. But the Court simply cannot draw from the Complaint an inference that the seriousness of the social-stigma allegations (and the consequences to Defendants from their response to a demand based on the social-stigma allegations)[18] is of such a degree that this overcomes the presumption Plaintiff must overcome. The above-stated principle from *Richardson* seems applicable even where the allegations are of especial seriousness.

---

[18] The Court does not doubt the seriousness, and the unique nature, of these allegations and these consequences. But the Court is unwilling to conclude that such seriousness by itself places the social-stigma allegations in the unique position of automatically overcoming the applicable presumption in favor of Defendants.

Moreover, Plaintiff has not otherwise pleaded enough facts to overcome this presumption and to create a reasonable doubt that a majority of the Directors could not have exercised their disinterested business judgment in the face of such demand.

In addition to making its social-stigma allegations, Plaintiff generally alleges in the Complaint that Defendants may be held liable for a breach of fiduciary duty towards Tractor Supply's shareholders. (*E.g.,* Doc. No. 1 at ¶¶ 41, 102). In the Response, Plaintiff elaborates on this alleged liability, and more clearly articulates the argument that "[b]ecause defendants each face a substantial likelihood of liability, and together constitute a majority of Tractor Supply's Board, the Complaint establishes futility of demand." (Doc. No. 47 at 10). The *Rales* test for demand futility requires that a majority of the Board is subject to a substantial likelihood of personal liability with respect to Plaintiff's claims—an analysis that is performed count by count, and director by director. *Melbourne Mun. Firefighters' Pension Tr. Fund ex rel. of Qualcomm, Inc. v. Jacobs*, 2016 WL 4076369, at *6 (Del. Ch. Aug. 1, 2016) (quoting *Teamsters Union Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 58 n.71 (Del. Ch. 2015)), aff'd 158 A.3d 449 (Del. 2017). And yet, with one exception,[19] Plaintiff does not make even a single assertion specific to any particular Director; Plaintiff does not attribute any particular statement to any particular Director, nor does Plaintiff suggest that any particular Director is specifically subject to a substantial likelihood of personal liability with respect to Plaintiff's claims. Plaintiff simply argues, in the Response, that "defendants face a substantial likelihood of liability to Tractor Supply

---

[19] The Complaint does quote Defendant Harry Lawton III as saying, in Tractor Supply's *Diversity and Inclusion Statement*, "We are committed to providing a diverse and inclusive culture where we foster different perspectives, ideas and innovative thinking. One of our values is respect –the starting point for our diversity and inclusion efforts." (Doc. No. 1 at ¶ 4). Even if a single claim like this otherwise could support a securities fraud claim (against Defendant Lawton), the Court concludes that it is not actionable based on reasons set forth herein with respect to Defendants' alleged misrepresentations as a whole.

for breach of loyalty, violations of §14(a) of the Exchange Act and unjust enrichment[ ]" and "Defendants constitute a majority of Tractor Supply's Board [. . .] therefore, a demand on the Board is excused as futile." (Doc. No. 47 at 13). As noted above, theoretically Plaintiff's more general allegations about the Board as a whole could be taken to apply to each Director individually, provided that the Complaint indicates why they should be so taken with respect to each individual Director. But because the Complaint fails to indicate why and how Plaintiff's general allegations apply to each individual Director, the Court cannot view the Complaint as adequately alleging personal liability on a director-by-director basis (as the *Rales* test for demand futility would require).

Count I alleges a Violation of Section 14(a) of the Exchange Act. A Section 14(a) claim requires showing that: "(1) a proxy statement contained a material misrepresentation which (2) caused the plaintiff injury and (3) that the proxy statement itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Gen. Elec. Co. v. Cathcart*, 980 F.2d 927, 932 (3d Cir. 1992). Plaintiff fails to show a substantial likelihood of personal responsibility as to each Director regarding the Section 14(a) claim.

Plaintiff points to a number of statements made by the Board regarding its commitment to diversity, which Plaintiff claims are false or misleading. But Plaintiff does not plausibly suggest that these statements are *actually* false or misrepresentations. One primary reason that Plaintiff cannot prove that these statements are actually misrepresentations is that, according to Defendants, "[t]he Corporate Governance Committee also considers diversity, such as diversity of gender, race and national origin, [age,] education, professional experience, and differences in viewpoints and skills." (Doc. No. 1 at para. 55). And from the Court's review of the Complaint, only a single alleged misrepresentation actually alludes to racial diversity in particular, namely the

representation (unattributed by Plaintiff to anyone, including any of the Defendants) in the 2020 proxy statement that "the Corporate Governance Committee is committed to actively seeking highly qualified women and individuals from minority groups to include in the pool from which Board nominees are selected." (*Id.* at ¶ 3). Even if this statement by itself otherwise could support a claim on Count I against one or more Defendants (which it cannot, for the reasons set forth herein with respect to defendants' alleged misrepresentations as a whole), Plaintiff does not set forth factual matter plausibly suggesting that this statement is false. True, the Complaint plausibly alleges that Defendants have "*declin[ed] to nominate* a single African American to the Tractor Supply Board over the past several years, despite up [sic] 45 opportunities for certain Defendants to do so[.]" (Doc. No. 1 at ¶ 13). But the Complaint contains no factual matter suggesting that Defendants (or anyone else at Tractor Supply, for that matter) have declined (or failed) to actively "*seek*[ ] highly qualified women and individuals from minority groups *to include in the pool from which Board nominees are selected*." It is one thing to decline to nominate any African Americans;[20] it quite another to decline (or fail) even to seek African American individuals to include in the pool from which candidates for the Board are nominated, and the Complaint does not provide any facts (and certainly no non-conclusory facts) suggesting such a declination or failure. *See Klein v. Ellison*, Case No. 20-cv-04439-JSC, 2021 WL 2075591, at *4 (N.D. Cal. May 24, 2021) ("Plaintiffs have not alleged particularized facts that support an inference that the 2019 Proxy's representation that Oracle 'actively seek[s] women and minority candidates from the pool from which director candidates are chosen' was false or misleading. First, that 'no Black individuals currently serve on the Board' does not support an inference of the statement's falsity.

---

[20] And the Court understands why Plaintiff maintains that this is a *bad* thing.

Second, the Complaint's allegation 'that the Board has never in good faith actively sought minority candidates' is a conclusion unsupported by particularized facts." (citations omitted)).

As to the other statements regarding the Board's commitment to diversity, none has plausibly been alleged to be a misrepresentation, inasmuch as Defendants explicitly define diversity to encompass a wider range of experiences and attributes than just race.

As highlighted by Defendants in their Motion and in the aforementioned cases, statements regarding diversity are often viewed by the Courts to be mere statements of corporate aspiration that are immaterial to a reasonable investor. *See Ocegueda on behalf of Facebook v. Zuckerberg*, No. 20-CV-04444-LB, 2021 WL 1056611, at *9 (N.D. Cal. Mar. 19, 2021) (finding that plaintiff did not plausibly plead statements that Facebook is committed to diversity to be "an actionable false statement" because courts hold that similar statements are "non-actionable puffery or aspirational (and hence immaterial)") (collecting cases). Defendants cite *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570—571 (6th Cir. 2004) for this proposition, which, while it does not expressly involve statements regarding a company's commitment to diversity, nonetheless emphasizes that "[c]ourts everywhere 'have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.'" *Id.* (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1217 (1st Cir.1996)). Examples of statements challenged by Plaintiff here that constitute mere "puffery" on which no reasonable investor would rely include: "[d]iversity and inclusion play a key role in moving our business forward," "[t]he Board of Directors of [Tractor Supply] is committed to the principles of diversity and inclusion,"

"[d]iversity and inclusion are values ingrained in our culture and essential to our business," and "[t]he Board and the Corporate Governance Committee believe that it is important that directors represent diverse viewpoints and individual perspectives." (Doc. No. 1 at 5-6).

Plaintiff disagrees and points to "[t]he United States Securities and Exchange Commission's ("SEC") adoption of Regulation S-K Items 401(e) and 407(c)(2)(vi), requiring public companies to disclose diversity data, including board of director demographics" to show that reasonable investors do rely on statements about diversity. (Doc. No. 47 at 23). But diversity data and demographics are much different than general statements from the Board about their "commitment" to diversity; a reasonable investor is much more likely to rely on actual facts and data regarding the diversity of a company (which here, the racial make-up of the Board is fully disclosed and available information to shareholders) rather than statements about the company's views on diversity efforts.

Plaintiff also fails to adequately allege causation, making personal liability for this claim unlikely. Plaintiff simply claims that because of the alleged misrepresentations and false proxy statements, the Board was re-elected. (Doc. No. 1 at ¶ 96 ("The 2020 and 2019 Proxy Statements were an essential link in Tractor Supply shareholders following the Company's recommendation to re-elect the Defendants to the Tractor Supply Board and approve the executive pay packages, as revelations of the truth would have immediately thwarted a continuation of the shareholders' endorsement of the directors' positions and the executive officers' compensation.")). Plaintiff provides no factual support for this conclusory allegation; while the Court must at this stage take all of the factual allegations in the Complaint as true, mere conclusory statements do not suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Here, Plaintiff has pleaded no facts that would allow the Court to draw a reasonable inference that there was a causal relationship between the allegedly

misleading statements in the 2019 and 2020 Proxy Statements regarding the Board's commitment to "diversity" and the Board's re-election. Therefore, the Court cannot treat this conclusory allegation as true.

Further, the Board's re-election seems to be the only "transaction" allegedly caused by the false and misleading proxy statements, and Plaintiff fails to tie that to any alleged economic harm. See *Murray v. Hosp. Corp. of Am.*, 682 F. Supp. 343, 348 (M.D. Tenn. 1988) (citation omitted), *aff'd*, 873 F.2d 972 (6th Cir. 1989) ("This requisite causal connection or 'transaction causation' is established where the 'harm to the plaintiffs ... [results] from the corporate transaction they authorized as a result of the false or misleading proxy solicitation.' . . . In other words, '[i]n order to recover damages under [section] 14(a) the proxy violation must have caused the economic harm alleged.'") Without Plaintiff adequately alleging any facts that would establish that the alleged proxy violation actually caused harm to the Plaintiff, personal liability on the part of Defendants for Plaintiff's Section 14(a) claim is highly unlikely.

Moreover, except to the extent that Defendant Harry Lawton III is identified as the one making a particular alleged misrepresentation, the Complaint essentially lumps all Defendants together. That is, it fails to "distinguish among those whom [Plaintiff] sue[s], [or to] enlighten each defendant as to that person's particular part in the alleged fraud." *Fener v. Belo Corp.*, 425 F. Supp. 2d 788, 811 (N.D. Tex. 2006). This is fatal to Count I, because it means that the Complaint fails to provide "the defendant-specific allegations that the PSLRA [Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4, *et seq.*] requires."[21] *Id.*

---

[21] As Defendants imply, the PSLRA is applicable to Count I. (Doc. No. 41 at 20). But *Iqbal* and *Twombly* also are applicable to all counts, of course, and as noted above likewise require defendant-specific allegations.

Count II alleges a breach of fiduciary duty. Plaintiff fails to show a substantial likelihood of personal responsibility as to each Director on the breach of fiduciary duty claim. As a preliminary matter, the parties agree that Delaware law applies but disagree as to whether Plaintiff's breach of fiduciary claim falls under the framework set out in *In re Caremark Int'l Derivative Litigation*, 698 A.2d 959 (Del. Ch. 1996). According to Plaintiff, this Count does not assert a "failure of oversight" claim; rather, the allegation focuses on the Board's conscious failure to act in the fact of a "known legal duty to act—here, a fiduciary duty of loyalty to speak the entire truth." (Doc. No. 47 at 31). According to Plaintiff, the alleged breach of fiduciary duty occurred when the Board "made knowingly false statements and omitted material facts regarding Tractor Supply's commitment to diversity." (*Id.*). But Defendants characterize the claim more so in terms of Plaintiff's allegation that the Defendants "recklessly caused the Company to disseminate . . . materially misleading and inaccurate information." (Doc. No. 41 at 31).

Here, the Court finds it necessary to note a significant factual omission (or, perhaps confusion) that prevents the Court from concluding not only that *Caremark* is inapplicable as Plaintiff suggests, but also that Plaintiff has plausibly alleged personal liability on the part of each Director (for the breach of fiduciary claim, as well as the other claims). Plaintiff does not articulate how Defendants themselves are actually responsible for any claimed false statements, omissions, or misrepresentations. Plaintiff does not make factual allegations stating that the Board prepares its proxy statements—the Court cannot simply assume (and, in fact, the Court finds it unlikely) that it is Defendants who actually prepare these statements. It is just as plausible to the Court that some other entity or individual within the company is the one responsible for writing proxy statements. Thus, without Plaintiff having alleged otherwise, if the Board has only a supervisory role in relation to these proxy statements (i.e., the Board simply "confirms" statements which are

prepared by some other entity), the Court is more persuaded by Defendants' view that a *Caremark* framework of a "failure of oversight" applies because, as far as the Complaint suggests, the Board would not in fact be making conscious false statements (as opposed to failing in its oversight duties to ensure that the proxy statements issued are accurate).

Assuming that *Caremark* does apply, Plaintiff has fallen short in its pleading. *Caremark* requires a showing that: "(a) the directors utterly failed to implement any reporting or information systems or controls, or (b) having implemented such systems or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006). Plaintiff did not allege either of these things, nor do any of the facts suggest as much. Thus it would be unlikely that personal liability would fall upon any Defendant under a *Caremark* approach to Plaintiff's breach of fiduciary duty claim.

And even if *Caremark* does not apply, and Plaintiff is correct that the theory at issue is *intentional* breach of fiduciary duty, Plaintiff fails to plead facts suggesting that each individual Director acted with the requisite intent. Plaintiff makes conclusory statements that Defendants made "knowingly false" statements (Doc. No. 1 at ¶ 58) and, with respect to each Defendant, makes the rote and conclusory allegation that the Defendant "publicly misrepresented Tractor Supply as a company that effectively promotes diversity throughout its ranks, including in the boardroom, when, in fact, it does not." (*Id.* at ¶¶ 24-34). But these broad and conclusory allegations as to all Defendants do not suffice to plausibly allege (with factual matter and defendant-by-

defendant, as required by *Iqbal* and *Twombly*) that any one particular Director intentionally made any false statement.[22]

Plaintiff's final claim alleges unjust enrichment. Plaintiff claims that Defendants were unjustly enriched by receiving compensation while breaching their fiduciary duty owed to Tractor Supply as Directors. (Doc. No. 1 at 38). But Plaintiff does not plausibly allege a claim of unjust enrichment, because it fails to plead a connection between the enrichment (compensation) and the conduct (making false or misleading statements). *MCG Capital Corp. v. Maginn, C.A. No. 4521*, 2010 WL 1782271, at *25 (Del. Ch. May 5, 2010). And as before, Plaintiff fails to allege facts suggesting that each individual Director (as opposed to "Defendants" as a group) face a substantial likelihood of personal liability for this unjust enrichment claim. Plaintiff thus again falls short of pleading facts sufficient to show a substantial likelihood of personal liability on the claim of unjust enrichment.

Analysis under *Aronson*

Even if Plaintiff's failure to make a pre-suit demand on the Board is viewed under the *Aronson* test, Plaintiff still fails to make the requisite showing of demand futility. The above analysis under *Rales* takes care of the first prong of the *Aronson* test (Plaintiff failed to allege a reasonable doubt as to whether a majority of the Board was "disinterested and independent").

---

[22] The Court notes also that Plaintiff oddly asserts that Defendants fail to seek dismissal of Plaintiff's "duty of loyalty" claim and that therefore their motion to dismiss this claim is "waived." (Doc. No. 47 at 23). Defendants devote several pages of their Motion to Plaintiff's Claim II (which Plaintiff itself actually states is a "breach of fiduciary duty" claim rather than a "breach of loyalty claim," which likely is why Defendants referred to it the same way and not as a breach of duty of loyalty claim). Plaintiff is misguided in stating that Defendants do not seek dismissal of this claim. Defendants simply view this claim under the *Caremark* framework (which Plaintiff itself includes as relevant in the Legal Standard section of its briefing)—and doing so surely does not waive Defendants' motion to dismiss this claim.

The second prong of the *Aronson* test is whether the pleading creates a reasonable doubt that "the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson*, 473 A.2d at 814. The question here is thus whether each false or misleading statement alleged by Plaintiff and each hiring of a non-African American Director was the product of a valid exercise of business judgment. As discussed above, the Court again struggles to characterize these generalized allegations of feigned support for diversity (or even specific prepared proxy statements) as "business transactions" that are attributable to the Board. But even assuming *arguendo* that Defendants indeed consciously made each challenged statement, Plaintiff has still failed to plausibly allege that these statements, and these hirings,[23] were not made as a valid exercise of business judgment. As previously stated, "[t]he key principle upon which this area of our jurisprudence is based is that the directors are entitled to a presumption that they were faithful to their fiduciary duties. In the context of presuit demand, the burden is upon the plaintiff in a derivative action to overcome that presumption." *Beam*, 845 A.2d 1040, 1048 (Del. 2004).

Plaintiff gives the Court no reason to find that any proxy statements prepared or ratified by Defendants or the Board, or their election of persons who in each case were not African American, was anything other than the product of a valid exercise of business judgment, particularly where

---

[23] The Court does not doubt that there were African American individuals available to serve on the Board who would have been excellent choices, such that their selection would have been a very sound exercise of business judgment. Indeed, the Court does not doubt that an argument could be made that the selection of some of these individuals would have been a subjectively sounder business decision than some of the selections that were made. But the Court here focuses on the decisions that *were* made—rather than the decision that *weren't* made—and asks whether Plaintiff's allegations sufficiently cast doubts on whether those decisions were the product of a valid exercise of business judgment. In answering that question, the Court keeps in mind that a decision does not have to be the "best" decision to be a decision based on the valid exercise of business judgment. The Court also notes that the Complaint does not allege that any particular African American potential candidate for a director position was passed over due to racial discrimination.

Plaintiff has alleged no facts establishing just how the Board is involved in the preparation or approval of proxy statements or in the Board election process.

Persuasive non-binding authority

The Court is further persuaded of the soundness of its reasoning when looking to the supplementary authority cited by Defendants.[24]

---

[24] Plaintiff likewise submitted supplementary authority in an attempt to bolster its response to the Motion. Plaintiff's citation to *Employees Retirement System of the City of St. Louis v. Jones, et al.*, No. 2:20-cv-04813, 2021 WL 1890490 (S.D. Ohio May 11, 2021), however, does little to help its position. In this case, the complaint alleges that Defendants paid over $60 million in illegal contributions to public officials in exchange for favorable legislation designed to bail out Defendants' failing nuclear power plants. This case is so factually dissimilar to the present case that it merits little attention, particularly because Plaintiff makes very little effort to describe why and how this decision is favorable to them. Plaintiff simply states that the court in *Jones* rejected three arguments: 1) that pleading a §14(a) claim requires allegations of mere negligence, not scienter; 2) that causation is adequately stated with allegations that shareholders "would not have voted to re-elect the current directors or approve executive compensation plans if they had been told the truth about their company through truthful proxy statements"; and 3) allegations that Board members actively participated in the illicit conduct and ordered the dissemination of misleading proxies is sufficient to plead demand futility. (Doc. No. 56 at 1–2). (As an initial matter, the Court notes that Plaintiff mischaracterizes these three statements as arguments made by the defendant that were rejected by the court in *Jones* when actually these are the court's holdings).

First, as Plaintiff will recognize by this Court's above analysis, it is unnecessary to reach whether proof of scienter is required for Plaintiff's §14(a) claim because Plaintiff fails to show a substantial likelihood of probability, irrespective of the mental state it is required to plead. Second, Plaintiff states that the court in *Jones* held causation to be adequately alleged via allegations that shareholders "would not have voted to re-elect the current directors or approve executive compensation plans if they had been told the truth about their company through truthful proxy statements." But *Jones* involved directors who had allegedly "orchestrat[ed] a large bribery, racketeering, and pay-to-play scheme with Ohio politicians." *Id.* at *1. It is easily inferable that shareholders knowing of such conduct would not have voted to re-elect or award executive compensation plan to those responsible for such activity. It is far less inferable that shareholders likewise would not have voted to re-elect persons whose alleged wrongdoing was—instead of bribery and racketeering, which are very serious and uniquely unsavory crimes—preaching while failing to practice diversity and then concealing that failure in proxy statements. Plaintiff finally notes that *Jones* states that "[a]llegations that Board members actively participated in the illicit conduct and ordered the dissemination of misleading proxies is sufficient to plead demand futility." But even if this is true under Ohio law, it is Delaware law which is to be applied in the present matter. Moreover, Plaintiff alleged no facts suggesting that the Board actively participated in any "illicit conduct" or intentionally ordered the dissemination of misleading proxies; in fact, Plaintiff fails to articulate just how Defendants were involved in the preparation or dissemination

In *Klein v. Ellison*, Case No. 20-cv-04439-JSC, 2021 WL 2075591 (N.D. Cal. May 24, 2021), Judge Corley granted defendants' motion to dismiss based on a failure to adequately plead demand futility. The facts in *Klein* are extremely similar to those in the present case: like here, the plaintiffs claimed demand was futile because the majority of the directors faced a substantial likelihood of liability on claims that the board issued false statements regarding the company's commitment to (gender) diversity. As noted above, Judge Corley held that statements that the defendants "actively sought" female/minority candidates, while no such individuals actually served on the board, did not support an inference of such statements' falsity. *Id*. at *4. Judge Corley also held that the plaintiffs "fail[ed] to plead any facts regarding the 'state of affairs' concerning Oracle's efforts to seek and promote minority candidates to its Board that the Proxies materially misrepresent." *Id*. This Court agrees with Defendants that the same is true here: the fact that no African American individuals were nominated to serve on the Tractor Supply board over a five-year period does not support an inference that the Board's statements regarding their commitment to diversity are false, especially given that many of the statements challenged by Plaintiff are merely aspirational in nature or related to diversity as a whole and not narrowly to racial diversity. Judge Corley's reasoning thus provides persuasive authority to this Court.

In *Falat v. Sacks*, Case No. SACV 20-1782 JVS (KESx), 2021 WL 1558940 (C.D. Cal. Apr. 8, 2021), Judge Selna granted defendants' motion to dismiss in another factually similar case involving allegedly false statements regarding the company's commitment to diversity. Judge Selna found that such statements "are mere puffery and do not constitute objectively verifiable statements of fact." (Doc. No 59 at 3). This Court agrees—a substantial likelihood of personal

of proxy statements at all. The Court is thus not convinced that *Jones* should be afforded any persuasive weight when considering Defendants' Motion.

liability as to a majority of the Board cannot be found where such liability rests on the alleged falsity of statements regarding the Tractor Supply board's commitment to diversity. Like Judge Selna, this Court does not view such statements to be statements of fact which could be verified as true or false.

In *In re Danaher Corp. S'holder Derivative Litig.*, No. 1:20-cv-02445-TNM, 2021 WL 2652367 (D.D.C. June 28, 2021), Judge McFadden granted the defendants' motion to dismiss in a similar diversity derivative suit on demand futility grounds. The complaint in that case is nearly identical to the Complaint in the present case, and involves the lack of African American diversity at Danaher. Applying the *Rales* test, the Court held: "[t]he Shareholders have not alleged demand futility with particularity. They have not shown that the Directors are interested—that is, face a substantial likelihood of personal liability—as to any of their three claims. The Shareholders were thus required to make demand on Danaher's Board, but they did not." *Id*. The *Danaher* Court emphasized that most of the statements challenged by the plaintiff did not really apply to the Board or imply that the Board (as opposed to the company or its workforce more generally) was actually diverse; thus, the plaintiff did not properly allege that these statements were actually "false." The same is true here: the above-quoted statements challenged by Plaintiff here include statements such as "[d]iversity and inclusion play a key role in moving our business forward," "[w]e believe that a diverse and inclusive workplace will enhance our ability to attract and retain the best talent to better serve our customers," and "[w]e are committed to providing a diverse and inclusive culture where we foster different perspectives, ideas and innovative thinking." (Doc. No. 1 at 2-3). As in *Danaher*, these statements do not represent that *the Board* itself in particular actually is racially diverse. The fact that there were no African Americans on the Tractor Supply Board is not inconsistent with the Board supporting a diverse and inclusive business and workplace—even

though the Board's commitment to one kind of diversity (racial diversity) naturally might be better demonstrated by having African American directors. This Court thus follows the same reasoning as the *Danaher* Court in reaching its conclusion to grant Defendants' Motion.

In *City of Pontiac Police and Fire Ret. Sys. v. Caldwell*, No. 20-cv-06794-LHK, 2021 WL 2711750 (N.D. Cal. July 1, 2021), Judge Koh granted defendants' motion to dismiss in another nearly identical diversity derivative suit for failure to sufficiently allege demand futility. The Court held that plaintiff failed to "clear the high bar for pleading demand futility" because it failed to "plead facts specific to each Director demonstrating that at least half of them knowingly violated a fiduciary duty." *Id*. at 6. Judge Koh's opinion rejects the notion that mere membership on a board, without specific allegations as to each individual director's role and/or conduct, is insufficient to impute knowledge or responsibility to each director for demand futility purposes. The Court reasoned that because the complaint "fails to identify any communications, meetings, or other particularized facts which show that anyone 'knowingly violated a fiduciary duty or failed to act in violation of a known duty to act,'" plaintiff failed to meet "Rule 23.1's stringent requirements of factual particularity" for demand futility. *Id*. at *8 (citing *Towers v. Iger*, 912 F.3d 523, 529 (9th Cir. 2018) and *Horman v. Abney*, No. 12290-VCS, 2017 WL 242571, at *12 (Del. Ch. Jan. 19, 2017)). The same is true here: with the single, ultimately immaterial, exception noted above, Plaintiff makes no particularized factual showing tying any one Director to any particular statement such that responsibility or knowledge could be imputed to that Director for that statement. Without that, as explained by Judge Koh, Plaintiff's claim that the Board made knowingly false or misleading statements regarding the company's commitment to diversity must be dismissed outright.

In *Esa v. NortonLifeLock Inc.*, Case No. 20-cv-05410-RS, 2021 WL 3861434 (N.D. Cal. Aug. 30, 2021) (another diversity-based derivative suit), Judge Seeborg granted defendants' motion to dismiss both for failure to sufficiently plead demand futility and for failure to state a claim. On 12(b)(6) grounds, the Court held that plaintiff failed to "plead an actionable false statement" where plaintiff challenged proxy statements representing the company's commitment to diversity because "[c]ourts routinely find similar statements to be non-actionable puffery or aspirational." *Id.* at *5. Regarding demand futility, the Court applied the *Rales* test, explaining that "plaintiff does not point to a specific decision or decisions to which an *Aronson* analysis is well-suited," reinforcing this Court's view that *Rales* is most appropriate here. *Id.* at *4. The *Esa* court went on to reiterate the same line of reasoning this Court employed above: plaintiff's claims rest on conclusory and unsupported assertions that all Defendants had knowledge of and were responsible for any discrepancies between statements made in the proxies and the reality of the company's "state of affairs." *Id.* Thus, like here, the Court held that the plaintiff could not show a substantial likelihood of liability as to at least a majority of the directors, as this showing "would include establishing their knowledge of illegal conduct." *Id.* at 4.

In *Lee v. Frost*, Case No. 21-20885-CIVALTONAGA/Torres, 2021 WL 3912651 (S.D. Fla. Sept. 1, 2021), Judge Altonaga granted defendants' motion to dismiss for failure to adequately plead demand futility. "First, the court determined that the plaintiff had failed to adequately allege that the directors face a substantial likelihood of liability on the plaintiff's breach of fiduciary duty claims where the plaintiff relied on "general and conclusory allegations," rather than particularized facts." *Id.* at **7–11. The same is true here: Plaintiff's Complaint generally alleges that the Board publicly represented its commitment to diversity whilst failing to actively seek diverse Board members. Yet Plaintiff fails to allege specific and particularized facts as to how to 1) the Board is

actually involved in the preparation of the challenged proxy statements (or otherwise had knowledge of falsities contained therein and caused the company to issue the statements nonetheless), and 2) how the statements made in the proxies are actually false or misleading (when, as explained above, many of the statements lack the capacity to even be verified).

Judge Altonaga also determined that the plaintiff had failed to adequately allege that the directors face a substantial likelihood of liability on the plaintiff's Section 14(a) claim because, among other things, "courts have repeatedly held that statements concerning a company's commitment to diversity are unactionable puffery" and mere "aspirational statements." *Id.* at *6– 7. This observation supports the Court's above position that the statements attributed to the Board here are similarly unactionable and aspirational.

Defendants then cite *Kiger v. Mollenkopf*, Civ. No. 21-409-RGA, 2021 WL 5299581 (D. Del. Nov. 15, 2021), where Judge Andrews granted defendants' motion to dismiss based on a failure to plead demand futility and a failure to state a claim under Rule 12(b)(6). Here, as summarized by the Court, "Plaintiffs allege that the Defendants breached their fiduciary duties and violated Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), by allowing unlawful and discriminatory practices to proliferate at the Company, thereby exposing the Company to significant risk." *Id.* at *1. On 12(b)(6) grounds, the court held (in relevant part) that the statement that "[t]he Governance Committee's goal is to assemble a board of directors that brings to us a diversity of perspectives and skills" constitutes "inactionable puffery," thus the plaintiffs failed to state a claim under Section 14(a) (and thus dismissed this claim with prejudice). This statement resembles the challenged statements in the present matter, and reinforces this Court's ruling that such a statement is mere puffery. The court's holdings on demand futility

grounds,[25] however, are not clearly applicable to the present case because the plaintiffs in *Kiger*, unlike Plaintiff here, argue that demand was futile because the defendants "face a substantial likelihood of liability for breaching their fiduciary duties by 'engaging in and tacitly endorsing illegal conduct.'" *Id.* at *7. This futility argument is quite distinct from any theory for demand futility raised by Plaintiff in the present case; thus, the Court rejects Defendants' suggestion that *Kiger* provides persuasive authority to rule in their favor on demand futility grounds.

Finally, Defendants cite City of Pontiac General Employees' Retirement System v. Bush, No. 20-cv-06651-JST (N.D. Cal. Mar. 1, 2022), where Judge Jon S. Tigar dismissed a shareholder derivate complaint in part due to the plaintiff's failure to state a claim under Section 14(a). The court held that the company's statements regarding diversity (that they "embrace[] diversity across the spectrum at every level," that the board of directors "believes it is important to consider diversity of race . . . in evaluating board candidates," and that "[d]iversity, inclusion, collaboration, and technology are fundamental to who we are, how we create the best teams, and how we will succeed in this age of digital transformation") were not actionable because they are neither misleading nor material to investors. (Doc. No. 64-1 at 6). The court reasoned that these are "aspirational" statements that "provide a vague statement of optimism not capable of objective verification" and are immaterial because they are "quintessential, non-actionable puffery." (*Id.* (internal quotation marks and citations omitted)). The court also held that Plaintiff failed to satisfy the causation requirement of Section 14(a), stating: "The connection between proxy statements and the non-nomination of a black director by way of director election is too tenuous to bear an 'essential link.' City of Pontiac tries to avoid this by crafting a causation theory built on the

---

[25] The Court notes that rather than deciding between the applicability of the *Aronson* test or the *Rales* test, Judge Andrews applied the "universal" test for demand futility set out in *United Food & Commercial Workers Union v. Zuckerberg* (discussed above).

deficient contention that Board director election itself somehow constitutes a loss-generating action. It is not." (*Id*. at 8). Such reasoning supports the Court's above discussion and conclusion that the statements at issue here are also "non-actionable puffery" and that Plaintiff failed to establish the relevant causation element.

These decisions all serve to reinforce the Court's conclusion that under the *Rales* framework for analyzing demand futility, Plaintiff failed to allege a substantial likelihood of personal liability on any of the claims brought in the Complaint and thus has failed to adequately plead demand futility.

<u>Nature of dismissal</u>

Having concluded that Plaintiff failed to meet the pleading requirements of Rule 23.1, the Court must determine whether dismissal of the Complaint with or without prejudice is appropriate. Many cases seem to pay no attention to whether dismissal should be with prejudice or without prejudice, but this Court joins those courts who have dealt with the issue expressly and intentionally. Of those courts, some have dismissed a plaintiff's complaint with prejudice under these circumstances. *See e.g.*, *Johnson v. Glassman*, 401 N.J. Super. 222, 950 A.2d 215 (App. Div. 2008) (upholding dismissal with prejudice where plaintiffs did not offer a proposed amended pleading suggesting their ability to cure demand futility-related defects); *Kanter v. Barella*, Civ. No. 04–5542, 2005 WL 3088336 (D.N.J. Nov. 16, 2005) (denying motion for reconsideration of dismissal with prejudice of Rule 23.1 shareholder derivative action for failure to plead with requisite particularly where plaintiff did not demonstrate that she would be able to cure the deficiencies in her original pleading) *aff'd Kanter v. Barella*, 489 F.3d 170, 181 (3d Cir. 2007); *Shabbouei*, 2020 WL 1609177, at *13 (dismissing complaint with prejudice where complaint failed to adequately plead demand futility); *Kenney v. Koenig*, 426 F. Supp. 2d 1175, 1188 (D.

Colo. 2006) (denying plaintiff's request for leave to amend complaint to cure demand futility pleading deficiencies because plaintiffs failed to provide any new factual allegations in response to the motion to dismiss that "might have cured their pleading deficiencies"); *Simmonds v. Credit Suisse Sec. (USA) LLC*, 638 F.3d 1072, 1097 (9th Cir. 2011) ("[A] complaint may be dismissed with prejudice on account of the plaintiff's failure to satisfy the demand requirement."), *vacated and remanded*, 566 U.S. 221, 132 S. Ct. 1414, 182 L. Ed. 2d 446 (2012); *Starrels v. First Nat. Bank of Chicago*, 870 F.2d 1168, 1172 (7th Cir. 1989) (upholding dismissal with prejudice for failure to make a demand or to allege with particularity why such a demand would be futile); *Gaubert v. Fed. Home Loan Bank Bd.*, 863 F.2d 59, 70 (D.C. Cir. 1988) (finding dismissal with prejudice appropriate where the plaintiff failed to meet Rule 23.1 demand futility pleading requirements).

But other courts have found that dismissal without prejudice is appropriate, particularly where the plaintiff filed a shareholder derivative action that includes demand futility allegations without having first sought corporate records via a "books and records" action (where the shareholder may, under state law, inspect a corporation's books and records).[26] *See, e.g.*, *King v. VeriFone Holdings, Inc.*, 12 A.3d 1140 (Del. 2011) (suggesting that dismissal without prejudice is appropriate when contemplating a post-complaint Section 220 books and records action to obtain copies of board minutes and other corporate records); *In re Johnson & Johnson Derivative Litig.*, 865 F. Supp. 2d 545, 581 (D.N.J. 2011) (dismissing complaint without prejudice and granting leave to amend, particularly in light of the possibility of a "books and records" action); *In re Ferro Corp. Derivative Litig.*, No. 1:04CV1626, 2006 WL 2038659, at *9 (N.D. Ohio Mar. 21,

---

[26] In Delaware, the law providing that provides a plaintiff with this possible course of action is Del. Code Ann. tit. 8, § 220.

2006), *aff'd*, 511 F.3d 611 (6th Cir. 2008), and *aff'd*, 511 F.3d 611 (6th Cir. 2008) (dismissing complaint without prejudice where complaint failed to adequately plead demand futility). As one district court explained, dismissing demand futility complaints with prejudice may "[go] too far" given Delaware statutes and precedent allowing "defeated plaintiffs to return to court—in the name of a derivative suit—after losing their first battle and subsequently initiating a separate-but-related books and records." *Dorfman on behalf of MGP Ingredients, Inc. v. Griffin*, No. 20-2239-DDC-JPO, 2021 WL 1209734, at *23 (D. Kan. Mar. 31, 2021) (finding dismissal without prejudice appropriate when "erring on the side of caution" in considering whether the plaintiff first pursued a books and records action before filing a derivative action, stating that "true finality is too much").

To say the least, the case law is not uniform on this issue. It is clear, however, that the determination of whether to dismiss the complaint with prejudice lies in the Court's discretion. *See Rales*, 971 F.2d at 1040 ("[W]e review both the district court's determination of demand futility and its decision to dismiss the complaint with prejudice under an abuse of discretion standard."). The Court is convinced that dismissal with prejudice is appropriate here. Plaintiff has not explained, nor can the Court think of any good reason, why an amended complaint would survive a motion to dismiss even after Plaintiff has conducted additional discovery via a books and records action, if Plaintiff were to choose to do so.[27] The Court cannot conceive of any additional information contained in Defendants' corporate records that would explain why making a demand on the Board could be excused as futile based on the Court's above discussion of the relevant (and remarkably high) burden for pleading demand futility. Furthermore, any amended complaint would be based on the same statements described in the Complaint that are unlikely to be found

---

[27] In Tennessee, T.C.A. § 48-26-102 provides shareholders with the ability to pursue a books and records action, and it is not clear whether Plaintiff has pursued any action under this statute.

actionable (as the Court has discussed in detail above and as supported by the extensive supplementary authority cited by Defendants). The Court thus doubts that Plaintiff could supplement the demand futility allegations to satisfy the requirements of Delaware law, nor has Plaintiff demonstrated that it would be able to cure demand futility-related defects via an amended complaint. Therefore, in its discretion, the Court will dismiss the Complaint with prejudice.

Plaintiff's request for Rule 56 discovery

Plaintiff argues that Defendants' reliance in their Motion on facts which took place after the Complaint was filed (i.e. the hiring of an African American woman to the Board and as general counsel) "requires that the Motion be denied, or at least deferred until appropriate discovery can be completed regarding the uncanny timing of defendants' appointment and hiring practices." (Doc. No. 47 at 18). But under Rule 12(d), it is only if such matters outside the pleadings are "not excluded by the court" must the Court convert the motion to dismiss to a motion for summary judgment and give the parties an opportunity to present all pertinent additional materials. The Court here does not include or consider any facts asserted by Defendants which were not pleaded in the complaint (or which occurred after the complaint was filed).[28] For this reason, Plaintiff's request for discovery under Rule 56 is denied.

---

[28] As for the possibility of the Court *both* considering the additional facts asserted by Defendants *and also* allowing Plaintiff additional discovery before deciding the demand futility issue, the Court declines to take that approach because "[t]he general rule in demand futility cases is that discovery may not be used to supplement demand futility allegations." *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, 493 F.3d 393, 398 (3d Cir. 2007). This makes sense inasmuch as a plaintiff should not need discovery to make demand futility allegations, *i.e.*, allegations as to *why* the plaintiff did not make a pre-suit demand, because this would be something within the plaintiff's knowledge. On the other hand, the Court realizes that discovery perhaps could help a plaintiff establish that the plaintiff's reason was the kind of reason that would pass muster under *Rales* or *Aronson*. But in any event, the Court follows the general rule stated above.

## CONCLUSION

As indicated above, "[s]uccessfully alleging that demand is excused . . . is a 'difficult feat under Delaware law.'" *City of Detroit Police & Fire Ret. Sys. on Behalf of NiSource Inc. v. Hamrock*, No. CV 20-577-LPS, 2021 WL 877720, at *3 (D. Del. Mar. 9, 2021) (quoting *Ryan v. Gifford*, 918 A.2d 341 352 n.23 (Del. Ch. 2007); *accord Canty v. Day*, 13 F. Supp. 3d 333, 345 (S.D.N.Y. 2014), *aff'd*, 599 F. App'x 20 (2d Cir. 2015). For the reasons discussed herein, the Court finds that Plaintiff has been unable to accomplish that feat. Thus, the Court will grant Defendants' Motion.[29] An appropriate order will be entered.

*Eli Richardson*
_____
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[29] The Motion will be granted without reaching Defendants' alternative argument that the Complaint was not properly verified.